UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

In re:

Laurestine Hatchett,                              Case No. 17-45163-MBM
                                                  Chapter 7
          Debtor.                                 Hon. Marci B. McIvor
_____/
Homer W. McClarty, Chapter 7 Trustee,

          Plaintiff,
v.                                                Adv. Case No. 17-

Elbert Hatchett; Elbert L. Hatchett, P.C.;
Hatchett, Dewalt & Hatchett, PLC; and
The United States of America, through
its agent, the Internal Revenue Service,

          Defendant.
_____/

## COMPLAINT

### I.  Jurisdiction

1.    This is an adversary proceeding brought under 11 U.S.C. §§ 544, 548,

and 550; and Fed. R. Bankr. P. 7001.

2.    This is a core proceeding over which this Court has jurisdiction. *See*

28 U.S.C. §§ 157(b)(2)(H) and 1334.

## II.     General Allegations

**A.     The Parties**

3.     Laurestine Hatchett is the Debtor in the underlying Involuntary Chapter 7 proceeding. The Involuntary Petition was filed on April 6, 2017, and an Order for Relief was entered on June 10, 2017. Prior to the commencement of the Involuntary proceedings, Laurestine Hatchett filed a **voluntary** Chapter 13 bankruptcy case on May 25, 2016, which case was voluntarily dismissed by the Debtor on April 5, 2017.

4.     Elbert Hatchett is the Debtor's spouse, as well as her co-guardian, having been appointed as such by Order of the Oakland County Probate Court, dated December 19, 2014. On May 11, 2016, the powers of Elbert Hatchett and co-guardian Ayanna Hatchett, Esq. were suspended by the Probate Court for failure or refusal to file annual reports, but later reinstated by Order dated July 27, 2016.

5.     Hatchett, DeWalt & Hatchett, PLC is a Michigan Limited Liability Company. Upon information and belief, Defendant Elbert L. Hatchett, P.C. is a member of Hatchett, DeWalt & Hatchett, PLC.

6.     Elbert L. Hatchett, P.C. is a Michigan Professional Corporation owned and controlled by Elbert L. Hatchett.

2

7.     The United States, and more specifically its agent, the Internal Revenue Service, is a governmental entity charged with the assessment and collection of taxes payable to the federal government.

8.     Homer W. McClarty is the duly-appointed Chapter 7 Trustee for the Debtor's bankruptcy estate.

**B.     Background**

9.     In 1989, Elbert Hatchett was convicted of four (4) counts of willful failure to pay federal income taxes (*US v Hatchett,* 918 F.2d 631, 633 (6th Cir. 1990)) and spent three (3) years in prison as result of his conviction. In March of 1998, Mr. Hatchett's tax liabilities totaled more than $8.6 million. *Elbert Hatchett and Laurestine Hatchett v. United States of America,* 330 F.3d 875, 879 (6th Cir. 2003).

10.     In an attempt to collect the delinquent taxes owed by Elbert Hatchett, the IRS levied against various properties owned by the Debtor and Elbert Hatchett, as tenants by the entireties, including, but not limited to, their residence at 285 W. Hickory Grove in Bloomfield Hills, Michigan ("Hickory Grove"); and a farm located in Lapeer, Michigan (the "Ranch"), which the Debtor and her husband had previously sold to Ernest and Harnitha Jarrett. *Id. at* 879.

11.     Following unsuccessful challenges to the government's liens and levies against Michigan property held as tenants by the entireties (*see, generally,*

*Hatchett v. USA, supra*), Elbert Hatchett and the Debtor negotiated a release of the federal government's tax liens against Hickory Grove by borrowing approximately $840,000 from an individual investor and paying the loan proceeds to the federal government in consideration of its release of the liens against the property. To secure the investor's loans, the Debtor and her husband executed a mortgage against their interest in Hickory Grove to the investor/lender, who subsequently assigned the obligation and mortgage to 285 W. Hickory Grove, LLC.

12.     As previously mentioned, the Debtor and her husband sold the Ranch before the government issued the tax levies. The Hatchetts sold the Ranch to their long-time friends Ernest and Harnitha Jarrett in 1991, either by land contract or a mortgage executed by the Jarretts in favor of the Debtor and Elbert Hatchett. The Ranch was sold for $80,000, to be paid in semiannual installments of $6,000 on interest and principal, beginning on February 19, 1992 and continuing until August 19, 2001. *Hatchett v. USA* at 879. The government levied the payments being made by the Jarretts. Upon information and belief, the Jarretts discontinued making any payments to the Hatchetts (or anyone else) after receipt of the IRS levies. On her Chapter 13 Bankruptcy Schedule B, the Debtor listed an "Account Receivable owed to the Debtor by Ernest and Hernitha [sp] Jarrett pursuant to a Judgment resulting from the sale of real estate," with a scheduled value of $36,000. (Case No. 16-47798 Docket No. 14, page 6 of 31.)

13.     In 2014, the government filed a Complaint in the United States

District Court for the Eastern District of Michigan against Elbert Hatchett's law

firm alleging, among other things—

> For various tax periods from 2003 to the present date,
> Hatchett, DeWalt & Hatchett, PLLC [an entity in which
> the Debtor's husband is a principal] has failed to comply
> with its federal tax obligations as established by the
> Internal Revenue Code (hereinafter, "I.R.C.") and has
> been engaging in an activity known as "pyramiding" by
> which a business withholds taxes from its employees but
> intentionally fails to remit them to the Internal Revenue
> Service as mandated by law.

*United States of America v. Hatchett, DeWalt & Hatchett, PLLC,* Case No. 14-cv-

10511.

14.     The 2014 Complaint alleges that since 2004, the IRS had attempted to

bring Hatchett, DeWalt & Hatchett into compliance with its payroll tax obligations

under the IRC, including visits in 2008 by representatives of the IRS with Elbert

Hatchett. Notwithstanding these visits, Hatchett, DeWalt & Hatchett began

accruing unpaid taxes again in 2010. The 2014 Complaint filed asserts that the firm

was liable for unpaid withholding taxes in the sum of $122,994.12 as of March 4,

2014.

15.     Hatchett, DeWalt & Hatchett stipulated to entry of a Judgment against

the law firm in the full amount claimed by the United States. (Exhibit A, April 3,

2014 Judgment.)

16.     Even after the settlement of the tax liens on Hickory Grove, Elbert

Hatchett remained indebted to the United States for millions of dollars in unpaid

tax liabilities. The settlement reached with the 285 W. Hickory Grove, LLC loans

only resolved the Hickory Grove tax liens and not the entirety of Elbert Hatchett's

tax obligations. Upon information and belief, Elbert Hatchett is still, today,

indebted to the United States for unpaid federal tax liabilities, potentially for

several millions of dollars.

17.     In July, 2009, the Debtor and Elbert Hatchett defaulted on their

obligations to 285 W. Hickory Grove, LLC by failing to make monthly payments

due under the terms of the agreement between the parties.

18.     285 W. Hickory Grove, LLC subsequently filed a Complaint for

Judicial Foreclosure of its mortgage in the Oakland County Circuit Court on

January 16, 2014 (*285 W. Hickory Grove, LLC v. Elbert Hatchett, Laurestine*

*Hatchett, United States of America, and Michigan Dept. of Treasury,* Case No. 14-

138370-CH). The Oakland County Circuit Court entered a "Judgment of

Foreclosure" on October 8, 2014, and later on March 30, 2016, entered an "Order

Confirming Partial Deficiency Amount Under Judgment of Foreclosure Dated

October 8, 2014". The March 30, 2016 Deficiency Judgment indicated that the

Debtor, Laurestine W. Hatchett, and her husband, Elbert Hatchett, were jointly and

severally liable to 285 W. Hickory Grove, LLC in the sum of $368,222.44, plus

interest of five (5%) percent per annum from April 20, 2016. (Exhibit B, Order Confirming Partial Deficiency.) No portion of the March 30, 2016 Deficiency Judgment has been paid, and the Debtor filed her Chapter 13 petition on the eve of efforts by 285 W. Hickory Grove, LLC to undertake post-judgment collection proceedings against the Debtor and her spouse.

19.     The actions described in this complaint evidence Elbert Hatchett's continuing efforts to willfully evade or defeat payment of his outstanding tax liabilities, as well as the obligations owed to 285 W. Hickory Grove, LLC.

## C.     The Appointment of Guardians and Conservators to Dissipate the Debtor's Assets

20.     As set forth above, 285 W. Hickory Grove, LLC filed its Complaint for Judicial Foreclosure in the Oakland County Circuit Court on January 16, 2014. In August of 2014, the Debtor's children, Ayanna Hatchett, Esq. and Franklin Hatchett, filed a Petition with the Oakland County Probate Court, seeking their appointment as "Co-Conservators" of the Debtor, based upon the Debtor's "mental illness," "[p]hysical illness or disability," and because the Debtor "has property that will be wasted or dissipated unless proper management is provided". The petition went on to state that "Mrs. Hatchett show[] signs of cognitive impairment consistent with dementia, i.e., poor memory, confusion, poor comprehension, etc."

21.     In response to the Petition, the Probate Court appointed a Guardian ad Litem to the Debtor. After meeting with the Debtor, Elbert Hatchett, and the

7

proposed Co-Conservators, Ayanna Hatchett, Esq. and Franklin Hatchett, the

Guardian ad Litem reported the following:

a.    After Medicare deductions, Mrs. Hatchett receives $933.00 monthly from Social Security.

b.    Ayanna Hatchett advised the Guardian that Laurestine Hatchett maintains balances on two credit cards: (1) Neiman Marcus Department Store for $1,200; and (2) Saks Fifth Avenue Department Store for $1,700.

c.    Two cars are registered in Laurestine Hatchett's name: (1) Mercedes 500 model year 2000. The estimated value is $6,000; and (2) Mercedes, model year 2004, Estimated value $15,000 to $18,000.

d.    Mrs. Hatchett and Franklin are co-owners of a 1,500 square foot condominium located at 700 N.E. 25th Avenue, Hallandale, Florida. Franklin described the condominium as three-bedrooms with two and one-half bathrooms. The estimated value is $350,000.00.

(Exhibit "C", Report of Guardian ad Litem filed with the Probate Court on

September 17, 2014.)

22.    Based upon her investigation, the Guardian ad Litem recommended

that the Probate Court:

a.    Determine Laurestine Hatchett is an [ ] who is adult unable to manage her property and business affairs effectively because of mental illness;

b.    Determine Laurestine Hatchett has property that will be wasted or dissipated unless proper management is provided;

c.    Appoint Ayanna Hatchett and Franklin Hatchett as co-conservators; and

8

d.  Determine Franklin Hatchett is not able to make decisions regarding Mrs. Hatchett's interest in the co-owned Florida property. Only Ayanna Hatchett will make decisions concerning the co-owned property.

23.  On September 17, 2014, the Oakland County Probate Court, Hon. Daniel O'Brien, issued an "Order Regarding Appointment of Conservator", appointing Franklin and Ayanna Hatchett as co-conservators of the Debtor. Both Franklin Hatchett and Ayanna Hatchett subsequently accepted their appointment, and the Probate Court issued Letters of Conservatorship on December 19, 2014.[1]

24.  In December of 2014, Elbert Hatchett and Ayanna Hatchett filed a Petition to appoint themselves as "Co-Guardians" of the Debtor. The Petition was approved by the Probate Court by Order dated December 19, 2014 (the same date the Probate Court issued Letters of Authority to Franklin Hatchett and Ayanna Hatchett, Esq. as co-conservators of the Debtor).[2]

---

[1]While the appointment was to expire on February 13, 2016, the Co-Conservators' authority was terminated by the Court on May 11, 2016, due to the failure or refusal of the Co-Conservators to file required Annual Reports. Following the filing of the necessary reports, the Probate Court reinstated the Co-Conservators' authority.

[2]Similar to the Co-Conservators' failure to perform their reporting obligations, the Co-Guardians' authority was later suspended by the Probate Court in May of 2016, due to the failure or refusal of the Co-Guardians to file the required "Annual Report of Guardian on Condition of Legally Incapacitated Individual". Following the filing of the necessary report, the Probate Court reinstated the Co-Guardians' authority.

9

25.     On February 27, 2015, the Co-Conservators filed an Inventory

disclosing the following property—

| Assets/Liabilities | Value | Amount owed |
|---|---|---|
| Florida condominium | $335,000 | $35,000 |
| Household furniture | $10,000 | |
| Jewelry | $5,000 | |
| 2000 Mercedes | $2,000 | |
| 2004 Mercedes | $18,000 | |
| Tax liens and notes | | $25,000 |
| Wearing apparel, including furs | $5,000 | |

(Exhibit D, February 27, 2015 Inventory.) Neither the disclosures to the Guardian

ad Litem nor the Inventory make any reference to the Foreclosure of the Debtor

and her husband's prior residence on October 8, 2014, or the pending lawsuit for

the deficiency judgment that eventually resulted in the "Order Confirming Partial

Deficiency Amount Under Judgment of Foreclosure Dated October 8, 2014"

entered on March 30, 2016 and determining the Debtor and her husband jointly

and severally liable for $368,222.44, plus interest.

26.     When asked why none of the liabilities, nor the jewelry or furs listed

on the inventory were disclosed to the Guardian ad Litem, and why no reference to

the pending liabilities to 285 W. Hickory Grove, LLC appeared in the Inventory, neither Elbert, Franklin, nor Ayanna Hatchett could provide any explanation.

27.    As indicated above, at the time of the appointment of her son and daughter as Co-Conservators, and her husband and daughter as Co-Guardians, the Debtor was a co-owner of the condominium located at 700 N.E. 25th Avenue, Hallandale, Florida (hereafter referred to as the "Florida Condo"). According to land records filed with the Broward County Commission in Florida, the Florida Condo was originally purchased by Debtor, Laurestine Hatchett, on May 14, 1993.

28.    The Florida Condo was owned solely by the Debtor until approximately August of 1994, when she executed a quit claim deed transferring title to herself and her daughter, Ayanna Hatchett, Esq., "as joint tenants with full rights or survivorship and not as tenants in common". Ownership of the Florida Condo changed hands again in June of 2005, when the Debtor and her daughter executed a second quit claim deed transferring title to the Debtor's son, Franklin Hatchett, alone. Thereafter, ownership was changed a third time on July 17, 2007, when Franklin Hatchett executed a third quit claim deed to himself and the Debtor, as "joint tenants with full rights of survivorship." It appears that no consideration was exchanged for any of the intra-family transfers, and none of the parties involved were able to provide any rational explanation for the foregoing changes in ownership.

29.     Notwithstanding representations made in the Application for Appointment of Co-Conservators that the Debtor "has property that will be wasted or dissipated unless proper management is provided"; and the recommendations of the Guardian ad Litem, that the appointment of Co-Conservators was necessary because "Laurestine Hatchett has property that will be wasted or dissipated unless proper management is provided", after obtaining their appointment as Co-Guardians and Co-Conservators, the Debtor's husband and children set about liquidating and dissipating the Debtor's property, the very act the Co-Conservators were appointed to prevent.

30.     Concurrent with the filing of the February 27, 2015 Inventory, Co-Conservators, Franklin Hatchett and Ayanna Hatchett, filed a "Petition Regarding Real Estate/Dwelling" seeking authority to sell the Florida Condo, for the purpose of "Discharging personal property tax and income taxes and pay off other debts." For further detail, the Petition referred to the "Continuation" attached as Exhibit E and later amended by Exhibit F. The Continuation Sheets indicated the Florida Condo needed to be sold in order to pay the following obligations, none of which were disclosed to the Guardian ad Litem:

    a.      Personal income tax liability in the amount of $20,000;

    b.      Payment of accrued property taxes on the Florida property in the approximate amount of $21,000 (2012, 2013 & 2014);

c.      Payment of accrued property taxes in lieu of rent on the residence @5459 Bristole [sp] Park Drive, Clarkston, Michigan in the approximate amount of $19,000 (2012, 2013, 2014);

d.      Repayment of personal loan secured by lien on Subject property in the amount of $3,000 from sister, Virginia Pinkney;

e.      Discharge lien on 2004 Mercedes to Mr. Larry Donaldson, loan recorded 2013 in the amount of $2,500;

f.      Payment of 1/2 of long term capital gains tax on sale of subject property in the amount of $18,000; and

g.      Other miscellaneous unsecured debts totaling $95,000.

The Exhibit F amendment of Exhibit E Continuation changed the amount to be paid to the Debtor's sister, Virginia Pinkney, from $3,000 to $30,000, and the amount necessary to discharge the lien owed to Mr. Larry Donaldson from $2,500 to $25,000, but was the same in all other material respects. Elbert, Franklin, and Ayanna were unable to provide any explanation for the following discrepancies—

a.      none of the foregoing debts were disclosed to the Guardian ad Litem;

b.      the Exhibit D Inventory listed only $75,000 in debt, compared to the $228,000 in debt listed in the amended Continuation (Exhibit F); and/or

13

        c.      none of the documents reference the unliquidated deficiency liability to 285 W. Hickory Grove, LLC.[3]

31.    On March 4, 2015, and following a hearing of the same date, the Probate Court granted the Co-Conservators' Petition to Sell the Florida Condo. The Order, which Ayanna Hatchett, Esq. testified was filled out in her handwriting, authorized "Ayanna Hatchett and/or Laurestine Hatchett" to sell the Florida Condo for the sum of $335,000, to proposed purchasers, Ronald and Elmerinda Centaro. When asked why the Order allowed the Conservator **OR** a person previously represented to "show signs of cognitive impairment consistent with dementia" and in need of both conservators and guardians, to complete the transaction, Ayanna Hatchett, Esq. was unable to provide any explanation.

32.    Documents subpoenaed from Chicago Title Insurance Agency, Inc. indicate that the sale of the Florida Condo closed on March 6, 2015. Out of the gross proceeds of the sale, the following debts were paid by the title company,

---

[3]Neither did the pleadings filed with the Probate Court indicate that "[p]ayment of accrued property taxes in lieu of rent on the residence @5459 Bristole[sp] Park, Clarkston, Michigan in the approximate amount of $19,000 was: (a) to or for the benefit of Ayanna Hatchett, Co-Conservator, as the owner of the Bristol Park property; and (b) was pursuant to an unwritten 'lease' which neither Ayanna Hatchett nor Elbert Hatchett were certain of the terms of, or provided conflicting testimony as to. Most importantly, however, was the complete lack of disclosure as to the self-dealing aspect of this particular expenditure to be paid from the proceeds of the sale of the Florida Condo.

14

along with real property taxes, homeowners association dues, and other closing

costs:

a.    H.B. and Virginia Pinkney            $33,226.05

b.    Tax lien to Internal Revenue Service   $16,689.56

33.    Upon information and belief, the closing on the sale of the Florida

Condo was attended by Franklin Hatchett, however all documents relating to the

sale of the Debtor's interest in the Florida Condo were sent to Michigan and

executed by Laurestine Hatchett, being witnessed by her husband, Elbert Hatchett,

and notarized by a notary public in Oakland County, Michigan.

34.    Documents subpoenaed from the title company[4] indicate that the

obligation to the Pinkneys relates to a promissory note in the sum of $30,000

purportedly executed on January 15, 2013 by Franklin Hatchett and Laurestine

Hatchett, and secured by a mortgage recorded against the Florida Condo on

January 29, 2015. When questioned about the Pinkney obligation, Franklin

Hatchett testified that he "assumed" the debt was owed by his mother, but that it

was not owed by him. Elbert, Ayanna, and Franklin Hatchett were unable to

---

[4] The documents were subpoenaed from the title company following the production
of unsigned or dated copies provided by the Debtor's husband, Elbert Hatchett, and
repeated requests made to the Co-Conservators, Franklin Hatchett and Ayanna
Hatchett, Esq., for copies of documents relating to the liens/mortgages on the
Florida property that were paid at closing and their failure or refusal to produce
such documents.

explain the use of the purported loan proceeds or provide any documents evidencing the Debtor's receipt or disposition of the loan proceeds.

35. Relative to the lien of the Internal Revenue Service, title documents indicate the lien was recorded against the Florida Condo on January 15, 2013, and related to unpaid personal income taxes owed by Laurestine Hatchett for tax years 2009 and 2010.

36. After payment of closing costs and the foregoing liens, the sale of the Florida Condo resulted in net proceeds of $262,343.75. According to an Addendum to the Settlement Statement, the title company issued two checks from the closing, to Franklin Hatchett, in the sum of $139,516.66, and to the Debtor, Laurestine Hatchett, in the sum of $122,827.09. A copy of Settlement Statement and Addendum are attached as Exhibit G.

37. The Debtor's son and Co-Conservator, Franklin Hatchett, testified that he received his half of the proceeds of the Florida Condo, and has spent the funds. He further testified that he was present in the Debtor's home at the time her check arrived, and turned the funds over to Elbert Hatchett. When asked why he, as Co-Conservator, charged with a fiduciary duty to protect the Debtor's funds, turned them over to a person who was **not** a conservator of the Debtor, Franklin Hatchett indicated that his father had handled his mother's finances for quite some time, so

16

he felt his father should handle them with relative to the proceeds of the sale of the Florida Condo.

38.     Elbert Hatchett has testified that the $122,827.09 was deposited into Hatchett, DeWalt & Hatchett's IOLTA account[5], and thereafter used to pay $104,096.14 to the Internal Revenue Service for outstanding income taxes owed by Elbert Hatchett; Elbert L. Hatchett, P.C., or Hatchett, DeWalt & Hatchett (the "Tax Transfers"); and to pay other expenses of Elbert L. Hatchett, P.C. and Hatchett, DeWalt & Hatchett (the "Non-Tax Transfers"). *See* attached Exhibit H, copies of March 10, 2015, Flagstar Bank Cashier's Checks in the sums of $12,000, $50,000, and $15,000; and Flagstar Bank Cashier's Checks in the sums of $1,250, $3,963.20, $8,221.68, $2,841.26, and $10,820.

39.     When questioned about the authority of Elbert Hatchett to use the Debtor's funds to make the Tax Transfers and Non-Tax Transfers, the Co-Conservators each testified that:

   a.     Elbert Hatchett had notified the other Co-Conservator of his intent to dispose of the proceeds before doing so;

   b.     each had not been aware of Elbert Hatchett's disposition of the Florida Condo proceeds until after the same had occurred;

---

[5]Notably, when asked to provide copies of bank statements evidencing the receipt and disposition of the proceeds of the sale of the Florida Condo, Elbert Hatchett produced some statements for accounts that were NOT IOLTA client trust accounts, but rather general accounts of one or the other of his law firms.

17

c.      notwithstanding their appointment as Co-Conservators, charged with the protection of the Debtor's assets, they had no opposition to Elbert Hatchett's possession of the Debtor's monies and/or his disposition of the same; and

d.      allowing Elbert Hatchett to take possession and control of the Debtor's funds, and dispose of the funds to pay tax liabilities and operating expenses of his business for which he was solely liable, was NOT a violation of their fiduciary duties as Co-Conservators of the Debtor.

40.     For Elbert Hatchett's part, he testified that taking possession and control of his wife's funds was consistent with his historical handling of his spouse's monies, and that the use of the funds to make the Tax Transfers and the Non-Tax Transfers was "necessary" to preserve his continuing ability to support his spouse.

41.     As set forth above, following the completion of the sale of the Florida Condo and dissipation of the approximately $122,000 in proceeds received from that property, Co-conservators, Ayanna Hatchett, Esq. and Franklin Hatchett, failed and/or refused to file annual accountings required by the Probate Court.

42.     Concurrent with filing a Petition for Re-Appointment, the Co-Conservators filed both an Amended Inventory of the property owned by the Debtor as of the date of the Co-Conservator's original appointment (amending Exhibit D), as well as a "First Annual Account of Fiduciary", indicating disposition of the Debtor's property between the dates of December 19, 2014 and

December 19, 2015. (*See* Exhibit I.) Notably, the Amended Inventory included the following changes:

> a.    reduction of the liens against the Florida Condo from $35,000 to $17,500; and
>
> b.    reduction of the value of the Florida Condo from $335,000 to $140,327.09.

The First Annual Account noted that during the one (1) year period between December 19, 2014 and December 19, 2015, the Debtor received proceeds from the sale of her Florida Condo in the amount of $122,827.09 and Social Security benefits in the sum of $11,328.00, and that this income had been used to pay:

> a.    a $75,000 liability to the IRS;
>
> b.    $15,400 for a "Leasehold acquisition 2015 vehicle";
>
> c.    $10,000 Payment on loan to Larry Donaldson;
>
> d.    $33,755.09 in "Living expenses"; and
>
> e.    $140,327.09 "700 NE 25th Ave., Hallandale Beach, FL.[6]

43.    Nowhere in the First Annual Account is it indicated that the $75,000 liability to the IRS was not an obligation of the Debtor.

---

[6]Although listed under the column of "Expenses, Losses and Other Disbursements", upon information and belief, the amount listed represents the approximate portion of the proceeds of the sale of the Florida Condo that were paid to Franklin Hatchett following the closing.

44.     When questioned as to the information included in the Exhibit I First

Account of Fiduciary, Elbert Hatchett testified that:

a.      the $75,000 payment to the IRS was incorrect, as the actual payment was higher;

b.      the payment was made with funds withdrawn from his client trust account an used to purchase cashier's checks payable to the United States Internal Revenue Service;

c.      the liability paid was not owed by the Debtor, and was owed by him, individually, or his businesses;

d.      the $15,400.00 payment was a lump-sum, pre-payment for a new 2015 Cadillac SRX leased in the name of the Debtor's son, Franklin Hatchett, for the Debtor's use;

e.      the lease was pre-paid, so that neither Elbert Hatchett nor the Co-Conservators would have to be bothered with making monthly payments on the lease;

f.      it was necessary to lease the new vehicle for the Debtor because the 2000 Mercedes Benz she was driving at the time was rusty and in disrepair;[7]

g.      he did not know when or how the $10,000 payment to Larry Donaldson was made; and

h.      he did not know what "Living expenses" were paid with the $33,755.09 referenced in the Exhibit I, First Account of Fiduciary, or how that number was calculated.

---

[7]When asked why the Debtor did not just drive the 2004 Mercedes SL500 titled in her name, Elbert Hatchett's only response was that he was driving this vehicle. Mr. Hatchett had no explanation for why his wife had not taken back the vehicle she owned, but which he was driving; and/or that **he** did not lease a new vehicle with **his own** income being generated from the operation of his law practice.

45.     The Co-Conservators were unable to shed any light on the foregoing expenses purportedly paid from the Debtor's monies, except to say that, with the exception of the "Leasehold acquisition" of the 2015 Cadillac SRX[8], all of the payments in question had been made by Elbert Hatchett and that allowing Mr. Hatchett to make these payments was consistent with their fiduciary duties to the Debtor.

46.     By the time of the Debtor's May 25, 2016 Chapter 13 filing, no proceeds from the sale of the Florida Condo remained, and her Schedule B, line 16 and 17 (Case No. 16-47798-MBM, docket 14) reflected cash of $200 and a savings account at PNC Bank with a balance of $0.

### i.     Building Located at 485 Orchard Lake Road, Pontiac, Michigan

47.     The Debtor's husband holds a direct or indirect interest in the law firms of Elbert Hatchett, P.C. and Hatchett, DeWalt & Hatchett, PLC. Both of those entities operate from the commercial office building at 485 Orchard Lake Road in Pontiac, Michigan ("485 Orchard Lake Road").

---

[8]On this issue, the Trustee received conflicting testimony from Elbert Hatchett, who indicated that Franklin Hatchett paid the $15,400 lease payment, and was reimbursed from Elbert Hatchett's law firm's IOLTA or general account; and Franklin Hatchett, who testified that he had paid the amount due under the pre-paid lease, but had not been reimbursed.

21

48.     Prior to April 3, 2012, the Debtor was either a fifty (50%) percent or fee owner of 485 Orchard Lake Road.

49.     On or about April 3, 2012, the Debtor conveyed her interest in 485 Orchard Lake Road to Christopher C. Brown via Quit Claim Deed recorded with the Oakland County Register of Deeds on April 4, 2012 (copy of Quit Claim Deed attached as Exhibit J).

50.     According to the Exhibit J Quit Claim Deed, the consideration for the transfer was the sum of twenty thousand and no/100 ($20,000) dollars.

51.     Upon information and belief, the value of the real property and commercial office building at 485 Orchard Lake Road (or even a one-half interest in that property) as of April 2012 was significantly greater than $20,000.

52.     When requested to provide evidence of consideration received by the Debtor for her transfer of her interest in the property at 485 Orchard Lake Road, both the Debtor and Christopher Brown produced the documents attached as Exhibit K.

53.     The documents attached as Exhibit K fail to establish adequate consideration from Christopher Brown to the Debtor for the April 3, 2012 transfer of the Debtor's interest in the property at 485 Orchard Lake Road. While all of the documents photocopied reference Affinity Group Credit Union, only "Check No. C1-129148" and listing "Chris C. Brown" as remitter even suggests any payment

of funds from Christopher Brown, let alone that the payments were to the Debtor and/or in consideration for the transfer of the Debtor's interest in 485 Orchard Lake Road. None of the other documents produced by the Debtor's Guardian bear any account number or other information identifying Christopher Brown as the payor of any monies to the Debtor.

54.     Furthermore, and more significantly, with the exception of Check Nos. 121494, 121495, and 121496, all of the documents produced suggest that the recipient of any monies referenced was "Elbert Hatchett PPC" or "Elbert Hatchett, P.C." and not the Debtor. Finally, the documents produced by the Debtor and Christopher Brown, to the extent they evidence payment of any monies from Christopher Brown to the Debtor, are all dated significantly before the actual transfer of the property at 485 Orchard Lake Road, and no documentation has been produced by any party to suggest that the amounts paid were pursuant to an agreement for the transfer of 485 Orchard Lake Road.

## ii.     The Bristol Park Property

55.     In 2010, and shortly after defaulting on their obligations to 285 W. Hickory Grove, LLC, the Debtor and her spouse moved into the property at 5459 Bristol Park in Clarkston, Michigan ("Bristol Park"), and have lived there since 2010.

56.     According to records filed with the Oakland County Register of Deeds, Bristol Park was purchased in June of 2010, at which time title was in the name of the Debtor, Laurestine Hatchett, and her daughter, Ayanna Hatchett, Esq. *See* attached Exhibit L, June 11, 2010 Warranty Deed recorded on June 23, 2010.

57.     Sixty-one (61) days after the purchase of Bristol Park, the Debtor purportedly transferred her interest in Bristol Park to her daughter, Ayanna Hatchett, Esq., "[f]or full consideration of: Less than $100." Although the Quit Claim Deed from the Debtor to her daughter purports to have been executed on August 15, 2010, it was not recorded with the Oakland County Register of Deeds until a full year later, on August 12, 2011.

58.     According to the closing documents for the purchase of Bristol Park, Ayanna Hatchett paid two hundred forty-five thousand and no/100 ($245,000) cash for the property.

59.     Documents produced by Ayanna Hatchett or other members of the Debtor's family show the source of funds used by Ayanna Hatchett to purchase Bristol Park were a one million, three hundred twenty-two thousand, five hundred forty-three and no/100 ($1,322,543.00) fee paid on or about April 7, 2009, by The Googasian Firm, P.C. in Bloomfield Hills, Michigan, to Ayanna Hatchett, for the referral of a personal injury case.

60.     Ayanna Hatchett testified that the client referred to the Googasian

Law Firm:

> a.     was referred through her brother, who worked with the referral
>        client's fiancé;
>
> b.     was referred to her when she had only been practicing for
>        "[m]aybe a couple of years" after her graduation from law
>        school; and
>
> c.     was referred to the Googasian Law Firm because George
>        Googasian was a law school classmate of her Father, Elbert
>        Hatchett.

Elbert Hatchett testified separately he had represented the referred client's husband

"at least once" prior to the accident that gave rise to the referral to The Googasian

Law Firm.

61.     Upon information and belief, the referral fee received by Ayanna

Hatchett, Esq. was actually owed to Elbert Hatchett, but was diverted to his

daughter to avoid collection action by the IRS against the fee, and to allow the

monies to be used to purchase a substitute residence for Elbert Hatchett and the

Debtor without interference or levy by creditors of Elbert Hatchett, including the

IRS. Upon further information and belief, Bristol Park was titled in the name of

Ayanna Hatchett to protect the property from collection by 285 W. Hickory Grove,

LLC, which was owed in excess of $840,000 at the time of the purchase of Bristol

Park.

62.     The terms of the Debtor and her husband's occupancy of Bristol Park are unclear and highly suspect. There is no written agreement setting forth the terms of occupancy of the property. The Debtor's Schedule G lists no executory contracts or unexpired leases. Ayanna Hatchett submitted documents to the Oakland County Probate Court indicating that a condominium in Florida owned by the Debtor and her son needed to be sold to pay outstanding obligations of the Debtor, including "payment of accrued property taxes in lieu of rent on residence @ 5459 Bristol[e] Park Drive, Clarkston Michigan in the approximate amount of $19,000 (2012, 2013, 2014)".[9] Ayanna Hatchett, Esq. provided rather confusing testimony as to the Debtor's (but apparently not Elbert Hatchett's) obligations relative to the occupancy of Bristol Park.

63.     Elbert Hatchett's testimony was only slightly clearer, indicating that he and the Debtor are only obligated to pay the real property taxes for Bristol Park in consideration of their occupancy of the property, and even then only if their finances allow for payment.

---

[9] It is also noteworthy that in representing to the Probate Court that proceeds from the sale of the Florida Condo would be used "to pay property taxes in lieu of rent" on Bristol Park, Ayanna Hatchett made no disclosure that the payment would be to or for her benefit as the holder of title to the Bristol Park property.

26

**D.    The Manipulation of Assets and eventual filing of the Bankruptcy**

64.    As indicated above, the Debtor's spouse, Elbert Hatchett, has been indebted to the United States for unpaid federal tax liabilities since 1998, owing $8.6 million as of that time period. *Elbert Hatchett and Laurestine Hatchett v. United States of America,* 330 F.3d 875, 879 (6th Cir. 2003). Upon information and belief, Mr. Hatchett still has substantial unpaid tax obligations.

65.    Upon information and belief, the appointment of himself and his children as Co-Guardians and Co-Conservators; the sale of the Florida Condo and disposition of proceeds received from the sale; the transfer of the building located at 485 Orchard Lake Road; the diversion of the referral fee from The Googasian Law Firm to Ayanna Hatchett; the use of those funds to secure a residence for the Debtor and her husband; and the transfer of that residence into and out of the Debtor's name, are all the product of Elbert Hatchett's elaborate attempts to avoid payment of his substantial tax liabilities, first through the titling of assets in the name of the Debtor, and later, after the Debtor's default in obligations owed as the result of payment of Elbert Hatchett's tax liabilities, to avoid payment of the Debtor's obligations.

66.    By way of example and not limitation, there is no rational explanation for the following actions, other than to hinder, delay and defraud creditors:

27

a.      The transfer of properties into entireties ownership with the belief that the same would be protected against IRS liens for liabilities owed only by Elbert Hatchett;

b.      The use of borrowed funds to settle IRS liabilities attaching as tax liens against entireties property, and the subsequent default in payment of those liabilities after use of the funds to settle nondischargeable tax obligations;

c.      The 2009 diversion of referral fees owed to Elbert Hatchett and/or Hatchett, DeWalt and Hatchett, PLC, to Ayanna Hatchett, who was not an employee, agent or representative of Hatchett, DeWalt & Hatchett, PLC, notwithstanding her alleged work out of the same offices as Elbert Hatchett and Hatchett, DeWalt & Hatchett, PLC and as co-counsel with those parties.[10]

d.      The use of the 2009 diverted referral fees to place an offer the same year, and in 2010 purchase a substitute residence for the Debtor and her husband following their default in $840,000 in mortgage obligations, and the subsequent foreclosure on the Debtor and her husband's former residence;

e.      The transfers of the Bristol Park property into and out of the Debtor's name, allegedly executed on August 15, 2010, approximately sixty (60) days after the purchase of the Bristol Park property on June 11, 2010, but not recorded until approximately one (1) year later, on August 12, 2011;

f.      The transfer of the office building occupied by Elbert Hatchett and his law firm out of the Debtor's name and into the name of a friend and former colleague of Elbert Hatchett for no or inadequate consideration in April of 2012, the same time that the Debtor was in default of her obligations to 285 W. Hickory Grove, LLC for the sum of $840,000;

---

[10]Particularly where it is documented that the referral fees would have been subject to levy and attachment by the IRS for the liabilities owed by Elbert Hatchett during the same time period, and/or by Hatchett, DeWalt & Hatchett, for its failure or refusal to remit employee withholding taxes during the same time period the referral fee was paid.

g.    The 'liening up' of the Debtor's assets with obligations for which there is no evidence the Debtor received any consideration;

h.    The initiation of proceedings in the Oakland County Probate Court to appoint himself and his daughter, Ayanna Hatchett, as Co-Guardians, and to appoint the Debtor's daughter, Ayanna Hatchett, and son, Franklin Hatchett, as Co-Conservators, followed by the methodical liquidation of any and all assets not subject to liens and/or exempt under State or Federal Law;

i.    Deposit into the accounts of Elbert Hatchett, PC and/or Hatchett, DeWalt & Hatchett, PLC, as opposed to the care and custody of the Debtor's Co-Conservators, of the $122,827.09 in proceeds payable to the Debtor from the March 6, 2015 sale of the Florida condominium, and the subsequent use of those funds by Elbert Hatchett to pay his own personal tax liabilities, or the liabilities or operating expenses of his law firms, Hatchett DeWalt & Hatchett, PLC and/or Elbert Hatchett, P.C.,[11] but in any event obligations which were not owed by the Debtor, and for which the Debtor received no consideration; and

j.    Elbert Hatchett's initiation of Chapter 13 proceedings on behalf of the Debtor on the eve of proceedings scheduled in the Oakland County Court which were supplementary to the 285 W. Hickory Grove, LLC $368,222.44 joint and several Judgment against the Debtor and Elbert Hatchett.

67.    Pursuant to 11 USC § 541, property of the estate in a proceeding commenced under the Bankruptcy Code includes,

(1)    Except as provided in subsections (b) and (c)(2) of this section, all legal and equitable interests of the debtor in property as of the date of commencement of the of the case.

---

[11]Potentially those owed by Hatchett, DeWalt & Hatchett under the US District Court Judgment entered on April 3, 2014. See Paragraph 14, above.

29

> (3)     Any interest in property that the trustee recovers under section 329(b), 363(n), 543, 550, 553, or 723 of this title.

Additionally, and pursuant to 11 USC § 1306(a), "[p]roperty of the estate includes, in addition to the property specified in section 541 of this title –

> (1)     all property of the kind specified in such section that the debtor acquires after the commencement of the case but before the case is closed, dismissed, or converted to a case under chapter 7, 11, or 12 of this title, whichever occurs first; and

> (2)     earnings from services performed by the debtor after the commencement of the case but before the case is closed, dismissed, or converted to a case under chapter 7, 11 or 12 of this title, whichever occurs first.

68.     Plaintiff has standing to avoid transfers pursuant to §§ 544, 545, 547, 548, 549, and 553(b) of the Bankruptcy Code and to recover avoided transfers for the benefit of the estate, pursuant to § 550. *See, generally, In re Johnson,* 26 BR 381 (Bkrtcy.CO. 1982); *In re Cecil,* 488 BR 200 (Bkrtcy.M.D.Fla. 2013).

69.     The Trustee intends to pursue the avoidable transfers set forth below, and to recover those transfers, once avoided, for the benefit of creditors in these proceedings.

## COUNT I
## AVOIDANCE OF TAX TRANSFERS UNDER M.C.L. § 566.34(1)

70.     Plaintiff restates paragraphs 1 through 69.

71.     The Trustee may exercise the rights of a creditor under state law,

including, but not limited to, Michigan's Uniform Fraudulent Transfer Act, M.C.L.

§ 566.31, *et seq*. *See* 11 U.S.C. § 544.

72.     The Debtor was indebted to 285 West Hickory Grove, LLC at the

time of the Tax Transfers, and the Debtor was still indebted to 285 West Hickory

Grove, LLC when she filed bankruptcy.

73.     The Tax Transfers were made with actual intent to hinder, delay, or

defraud the Debtor's creditors.

74.     The Debtor did not receive reasonably equivalent value in exchange

for the Tax Transfers.

75.     The Debtor was insolvent at the time of the Tax Transfers.

76.     The Tax Transfers are fraudulent as to creditors and avoidable by the

Trustee. *See* M.C.L. §§ 566.34(1)(a) and 566.37.

Wherefore, the Trustee respectfully requests that this Court enter a judgment

avoiding the Tax Transfers and grant such further relief as this Court deems

appropriate.

## COUNT II
## AVOIDANCE OF TAX TRANSFERS UNDER M.C.L. § 566.35

77.     Plaintiff restates paragraphs 1 through 76.

78.     Debtor made the Tax Transfers without receiving a reasonably equivalent value in exchange for the Tax Transfers.

79.     The Debtor was insolvent at the time of the Tax Transfers.

80.     At the time of the Tax Transfers, the Debtor was generally not paying her debts as they became due.

81.     The Tax Transfers are fraudulent as to creditors and avoidable by the Trustee. *See* M.C.L. §§ 566.35(1) and 566.37.

Wherefore, the Trustee respectfully requests that this Court enter a judgment avoiding the Tax Transfers and grant such further relief as this Court deems appropriate.

## COUNT III
## RECOVERY OF TAX TRANSFERS UNDER 11 U.S.C. § 550

82.     Plaintiff restates paragraphs 1 through 81.

83.     Defendants are the initial transferees of the Tax Transfer; the entities for whose benefit such Tax Transfers were made; or the mediate transferees of the Tax Transfers.

84.     The Trustee may recover the Tax Transfers or the value of the Tax Transfers from Defendants. *See* 11 U.S.C. § 550.

Wherefore, the Trustee respectfully requests that this Court enter a judgment against Defendants, jointly and severally, for $104,096.14, plus interest and costs.

## COUNT IV
## AVOIDANCE OF TAX TRANSFERS UNDER M.C.L. § 600.6131(1)

85.    Plaintiff restates paragraphs 1 through 84.

86.    The Trustee is a hypothetical judicial lien creditor holding an unsatisfied execution against the Debtor. *See* 11 U.S.C. § 544(a).

87.    The Tax Transfers were made to or for the benefit of Defendants.

88.    The burden of proof is on the Debtor or Defendants to show that the Tax Transfers were, in all respects, bona fide or that Defendant is not holding the funds as trustee of the Debtor. *See* M.C.L. § 600.6131(1).

Wherefore, the Trustee respectfully requests that this Court enter a judgment a) avoiding the Tax Transfers and b) finding that the $104,096.14 is held in trust for the bankruptcy estate, and c) grant such further relief as this Court deems appropriate.

## COUNT V
## AVOIDANCE OF NON-TAX TRANSFERS UNDER M.C.L. § 566.34(1)

89.    Plaintiff restates paragraphs 1 through 88.

90.    The Trustee may exercise the rights of a creditor under state law, including, but not limited to, Michigan's Uniform Fraudulent Transfer Act, M.C.L. § 566.31, *et seq. See* 11 U.S.C. § 544.

33

91. The Debtor was indebted to 285 West Hickory Grove, LLC at the time of the Tax Transfers, and the Debtor was still indebted to 285 West Hickory Grove, LLC when she filed bankruptcy.

92. The Non-Tax Transfers were made with actual intent to hinder, delay, or defraud the Debtor's creditors.

93. The Debtor did not receive reasonably equivalent value in exchange for the Non-Tax Transfers.

94. The Debtor was insolvent at the time of the Non-Tax Transfers.

95. The Non-Tax Transfers are fraudulent as to creditors and avoidable by the Trustee. *See* M.C.L. §§ 566.34(1)(a) and 566.37.

Wherefore, the Trustee respectfully requests that this Court enter a judgment avoiding the Non-Tax Transfers and grant such further relief as this Court deems appropriate.

## COUNT VI
## AVOIDANCE OF NON-TAX TRANSFERS UNDER M.C.L. § 566.35

96. Plaintiff restates paragraphs 1 through 95.

97. The Debtor made the Non-Tax Transfers without receiving a reasonably equivalent value in exchange for the Non-Tax Transfers.

98. The Debtor was insolvent at the time of the Non-Tax Transfers.

99. At the time of the Non-Tax Transfers, the Debtor was generally not paying her debts as they became due.

34

100.   The Non-Tax Transfers are fraudulent as to creditors and avoidable by the Trustee. *See* M.C.L. §§ 566.35(1) and 566.37.

Wherefore, the Trustee respectfully requests that this Court enter a judgment avoiding the Non-Tax Transfers and grant such further relief as this Court deems appropriate.

**COUNT VII**
**RECOVERY OF NON-TAX TRANSFERS UNDER 11 U.S.C. § 550**

101.   Plaintiff restates paragraphs 1 through 100.

102.   Elbert L. Hatchett, P.C. and Hatchett, Dewalt & Hatchett, PLC are the initial transferees of the Non-Tax Transfers.

103.   The Trustee may recover the Non-Tax Transfers or the value of the Non-Tax Transfers from Elbert L. Hatchett, P.C. and Hatchett, Dewalt & Hatchett, PLC. *See* 11 U.S.C. § 550.

Wherefore, the Trustee respectfully requests that this Court enter a judgment against Elbert L. Hatchett, P.C. and Hatchett, Dewalt & Hatchett, PLC for $18,730.95, plus interest and costs.

**COUNT VIII**
**AVOIDANCE OF NON-TAX TRANSFERS UNDER M.C.L. § 600.6131(1)**

104.   Plaintiff restates paragraphs 1 through 103.

105.   The Trustee is a hypothetical judicial lien creditor holding an unsatisfied execution against the Debtor. *See* 11 U.S.C. § 544(a).

35

106.    The Non-Tax Transfers were made to or for the benefit of Defendants.

107.    The burden of proof is on the Debtor; Elbert L. Hatchett, P.C.; or Hatchett, Dewalt & Hatchett, PLC to show that the Non-Tax Transfers were, in all respects, bona fide or that Elbert L. Hatchett, P.C. and Hatchett, Dewalt & Hatchett, PLC are not holding the funds as trustee of the Debtor. *See* M.C.L. § 600.6131(1).

Wherefore, the Trustee respectfully requests that this Court enter a judgment a) avoiding the Non-Tax Transfers and b) finding that the $18,730.95 is held in trust for the bankruptcy estate by Elbert L. Hatchett, P.C. and Hatchett, Dewalt & Hatchett, PLC, and grant such further relief as this Court deems appropriate.

Steinberg Shapiro & Clark

/s/ Mark H. Shapiro (P43134)
Special Counsel for Chapter 7 Trustee
25925 Telegraph Road, Suite 203
Southfield, MI  48033
248-352-4700
shapiro@steinbergshapiro.com

Date:  October 6, 2017